**In re Jorge H. PINO, Debtor.**

**Jorge H. Pino, Plaintiff,**

v.

**Elena Pino, Defendant.**

**Bankruptcy No. 00–31547–LK.**
**Adversary No. 00–3044–LK.**

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

Aug. 15, 2001.

484

E.P. Bud Kirk, El Paso, TX, for plaintiff.

Don W. Minton, El Paso, TX, for defendant.

## MEMORANDUM OPINION

LARRY E. KELLY, Bankruptcy Judge.

Before the Court is Debtor's Complaint to Determine Dischargeability of Debt. The Complaint describes six debts, each of which is recognized to arise out of a divorce, and asks the Court to determine whether they are non-dischargeable under § 523(a)(5) or § 523(a)(15), and if under § 523(a)(15), whether the Debtor is entitled to a discharge under the exceptions to non-dischargeability of marital debts under § 523(a)(15)(A) or (B). A timely Response and Counterclaim was filed by the Defendant (non-debtor spouse) also asking the court to determine the issues under 11 U.S.C. § 523(a)(5) and (a)(15). The matter was tried before the court on May 31, 2001. After considering argument of the counsel, the evidence presented, observing the candor and demeanor of the witnesses and otherwise being duly advised in the premises, the court enters the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a) as adopted by Fed.R.Bankr.P. 7052. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and this court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and 28 U.S.C. § 157(a) & (b)(1).

### BACKGROUND INFORMATION

The Debtor Jorge Pino was married one time prior to his marriage to Elena. That marriage dissolved in divorce in or about 1993. He then married Elena. He and Elena had been involved in an ongoing relationship for several years before their marriage. They had two children and adopted a third. These children and their years of birth are Jorge (Coco)—1986, Julian—1991; and Briana—1993. The couple divorced in June 1999.

Mr. Pino is a pilot for Federal Express and earns approximately $180,000 per year. He is currently 52 years old and faces mandatory retirement at age 60, 7½ years from this date. He earned a B.S. degree in aeronautical engineering and served in the Marines for about 10 years. He is not eligible for any military retirement pay. Ms. Pino is 42 years old. She is a registered nurse with a Masters of Science degree, and is currently employed by Columbia Healthcare System earning approximately $58,000 per year and participates in the company's 401k plan. Both parties now live in the El Paso area in the State of Texas.

During the marriage Jorge and Elena became involved with two orphans, nephews of a girl who worked for them. The two boys, Eusebio and Jesus, were Mexican Nationals. While married, the couple initiated actions to adopt the two children. With the divorce pending, Elena withdrew from the adoption process. Mr. Pino advises the court that he continued with adoption proceedings. Since the divorce he has remarried and has completed the adoption process with Jesus. However, at the time of trial, Jesus was still living in Juarez, Mexico in a house rented by the Debtor and with a housekeeper paid for by the Debtor. Eusebio is now living in Durango, Mexico in a boarding school and is being supported by the Debtor. The information about the current status of these two children and the status of adoption proceedings was all provided through oral testimony. No documents, court papers, or written evidence was introduced to establish the accuracy of this information.

While married, Jorge and Elena Pino enjoyed a "high standard" of living. They built a luxurious and expensive home in New Mexico, referred to as the Appaloosa house, owned another home in which Elena operated a child care business in El Paso, and owned yet a third a home in Memphis, Tennessee. They had a Lincoln Navigator automobile and a new Motor Home. According to the divorce papers they owned quite a bit of furniture, a collection of art work and various items described as "collectibles." With this standard of living came a lot of debt. The divorce itself was worked out in two major stages. A Bifurcated Judgment of Divorce (Px–3) was entered on or about June 28, 1999 which actually granted the divorce. A Final Judgment on Reserved Issues was entered on June 12, 2000 which essentially divided the property, debts and established the child support and custody arrangements.

Since the divorce Mr. Pino has remarried. He acquired a smaller home in El Paso and drives a 1989 van with over 175,000 miles on it. Ms. Pino has not remarried, now resides in the house that was once used for her child care business, and has a 1995 Pontiac, a 1993 Ford pickup and a the 1997 Motor Home. The two younger children reside full time with Ms. Pino while Jorge (Coco) has moved back with Mr. Pino. Child support is being paid by Mr. Pino in the amount of $3,851/month. Mr. Pino also maintains a $600,000 policy of life insurance with the children listed as beneficiaries, pays approximately 75% of any extracurricular activity expense they are involved with and maintains health insurance coverage for them. Mr. Pino also had part of his retirement account with Federal Express allocated to Elena Pino; she would be entitled to $1,000/month upon his retirement.

The two parties agreed at trial that of all the issues involved in their divorce, there were only 6 debts which Mr. Pino was ordered to pay in the divorce that are in dispute.. They are described as follows:

1. $30,000—attorney fees owed to Elena Pino's attorney;

2. $15,628—"equalization payment";

3. $3,231.49—bill of Levitz furniture company;

4. $48,000—unpaid mortgage payments to Norwest;

5. unknown deficiency amount from foreclosure of home in New Mexico;

6. $5,000—to Elena for loan used to pay obligation to first wife.

What the parties disagree on is whether the specified obligations fall within the "support or maintenance" provisions of 11 U.S.C. 523(a)(5) or the "property settlement" provisions of 11 U.S.C. 523(a)(15) and if under this latter section, whether the Debtor is entitled to discharge all or any of them.

## ANALYSIS

### I. Discussion—11 U.S.C. § 523(a)(5):

Section 523(a) of the Bankruptcy Code excepts certain categories of debts from a debtor's discharge granted under section 727, 1141, 1228(a), 1228(b) or 1328(b). Among the debts rendered non dischargeable by this provision are marital obligations owed to a spouse, former spouse, or child of the Debtor incurred by the Debtor in the course of a divorce or separation. Specifically, § 523(a)(5) of the Code excepts from discharge any debt:

to a spouse, former spouse, or child of the Debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

(A) such debt is assigned to another entity, voluntarily, by operation of law, or otherwise (other than debts assigned pursuant to section 408(a)(3) of the So-

cial Security Act, or any such debt which has been assigned to the Federal Government or to a State or any political subdivision of such State); or

(B) such debts includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.

11 U.S.C. § 523(a)(5).

Thus, under § 523(a)(5), a debt that is "actually in the nature of alimony, maintenance or support of a spouse, former spouse, or child of the Debtor" is non-dischargeable in bankruptcy. The burden of proof is on the person who asserts non-dischargeability of a debt to prove its exemption from discharge. *In re Benich,* 811 F.2d 943, 944 (5th Cir.1987); *In re Harrell,* 754 F.2d 902, 904 (11th Cir.1985). The standard of proof is by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991).

The question of whether a particular debt constitutes "alimony, maintenance or support" is a question of federal bankruptcy law, and not of state law. In re Strickland, 90 F.3d 444, 446 (11th Cir. 1996); In re Tatge, 212 B.R. 604, 608 (8th Cir.BAP1997); H.R. REP. NO. 95–959, 95th Cong. & Ad. News at p. 6319 (1977). The crucial issue in making this determination is the intent of the parties (or the divorce court) and the function the award was intended to serve at the time of the divorce. Cummings v. Cummings, 244 F.3d 1263, 1265–66 (11th Cir.2001); In re Kline, 65 F.3d 749, 751 (8th Cir.1995). To make this determination, a bankruptcy court should undertake "a simple inquiry as to whether the obligation can legitimately be characterized as support, that is, whether it is in the nature of support". In re Harrell, 754 F.2d 902, 906 (11th Cir.

1985) If the debt is in the nature of "alimony, maintenance or support," the debt is not dischargeable.

■ The Fifth Circuit has set forth a list of factors to consider in determining this issue, including intent of the parties. See Dennis v. Dennis, 25 F.3d 274, 279 (5th Cir.1994); In re Davidson, 947 F.2d 1294, 1296 (5th Cir.1991); In re Benich, 811 F.2d 943, 945 (5th Cir.1987). In Dennis, the Fifth Circuit stated:

> [T]his Court set forth a nonexclusive list of factors which bankruptcy courts should review in deciding whether a divorce obligation constitutes alimony, maintenance, or support. The considerations include the parties' disparity in earning capacity, their relative business opportunities, their physical condition, their educational background, their probable future financial needs, and the benefits each party would have received had the marriage continued.

■ In the context of § 523(a)(5), "substance prevails over form." In re Warren, 160 B.R. 395, 398 (Bankr.D.Me. 1993); In re Sweck, 174 B.R. 532, 534 (Bankr.D.R.I., 1994)(Code requires the bankruptcy court "to determine the nature of the debts, regardless of the labels placed on them by the parties or the family court"). In conducting this inquiry, a court cannot rely solely on the label used by the parties. As other courts have recognized, "it is likely that neither the parties nor the divorce court contemplated the effect of a subsequent bankruptcy when the obligation arose." In re Gianakas, 917 F.2d 759, 762 (3rd Cir.1990) (citations omitted). Applying federal principles, the bankruptcy court must examine the circumstances that existed at the time that the obligation was created to ascertain whether it then functioned to provide support to the non-Debtor obligee. In re Sweck, 174 B.R. at 535; In re Fitzgerald, 9

F.3d 517 (6th Cir.1993); In re Sampson, 997 F.2d 717, 723 (10th Cir.1993); In re Gianakas, 917 F.2d 759, 763 (3rd Cir.1990) (While the intention of the parties or the divorce court is the ultimate question, even the uncontradicted testimony of one of the spouses is not decisive. The trial court is entitled to weigh the credibility of the witness, the worth of the testimony when weighed against the language of the agreement, the actual situation of the parties at the time when the agreement was made, and any other evidence that may help to determine the reality of the nature of the payments.)

Other than the two "judgments" introduced as Plaintiff's Exhibits 2 and 3, the court received no other pleadings from the state court divorce proceedings, no transcript of the proceedings and no copy of an "Interim Order" which is referred to in several places in Px. 2, ¶ 17, 18, 21 or any of the exhibits, transcript, pleadings or orders emanating from the contempt hearing and testimony on offsets, held in September 1999. See Px. 2 ¶ 18. These items would have been helpful in discerning the intent of the divorce court with respect to several of the debt obligations in this case. The six debt obligations will be discussed individually:

### First: $30,000 attorney fee obligation for Elena Pino's divorce court attorney:

■ Paragraph 21 of Px–2 provides:
The Court finds there is a disparity of income between the parties, and that it is appropriate to require Petitioner to contribute an additional amount toward Respondent's attorneys fees. It is acknowledged that pursuant to an *interim order*, Petitioner paid $1,190.78 of Respondent's attorneys fees. Petitioner shall pay the additional sum of $30,000 toward Respondent's attorneys fees within one year of the entry of the final decree. Any attorneys fees incurred by

Respondent in excess of $31,190.78 shall be the responsibility of the Respondent. Petitioner is solely responsible for his attorneys fees and costs. (emphasis added)

The referenced "interim order" is the one which has not been provided to this court. Counsel for the Debtor argues that since he was ordered to pay the specific sum of $1,190.78 during the divorce trial, that sum should be presumed to be the only amount that was necessary to assist Elena Pino and that any additional sums added on at the end of the divorce proceedings are to be treated merely as ordinary debt and handled under § 523(a)(15). Ms. Pino's counsel urges that the parties' disparity of income, the fact that there were three minor children involved, and that the divorce proceedings took over a year to complete, show that the trial court was attempting to provide sufficient funds to see that Ms. Pino's interests were protected. No other evidence was presented on this point, no testimony from any counsel from the divorce, no transcript, and frankly little testimony from the two litigants before this court.

From the sparse evidence presented this court, the following facts are evident. The divorce proceeding between these two parties was acrimonious. There were three minor children involved, dozens of items of property valued at several hundred thousands of dollars and debt which, including the Appaloosa house, was in the neighborhood of $800,000. At the time of the proceedings Jorge Pino earned $180,000/year and Elena Pino earned under $60,000. Elena Pino's attorneys fees exceeded 50% of her gross annual salary. The divorce court deemed it necessary to enter an interim order requiring Jorge Pino to advance some of Elena Pino's attorney's fees during the trial. None of the property ultimately awarded to Elena Pino (Px–2,

Schedule .B) shows any readily available source of funds from which to pay such fees.

Many courts have found that attorney's fees are deemed non-dischargeable debt in order to provide a party with the financial means to represent adequately their interests during the divorce. See e.g., *Marcus, Ollman & Kommer v. Pierce,* 198 B.R. 665 (S.D.N.Y.1996); *Kavanakudiyil v. Kavanakudiyil,* 143 B.R. 598 (Bankr.S.D.N.Y. 1992). *In re Silberfein,* 138 B.R. 778, 781 (Bkrtcy.S.D.N.Y.1992) ("If a debtor is ordered to pay an ex-spouses' attorneys fees incident to a dissolution, and the fees awarded are based upon need, such fees are usually non dischargeable being in the nature of support"), citing *In re Hart,* 130 B.R. 817, 825 (Bankr.N.D.Ind.1991); *In re Will,* 116 B.R. 254, 256 (D.Colo.1990).

This court is convinced that the attorney's fees awarded during the Pino divorce were based upon need and represent an award for support or maintenance. As such this Court finds that they are non-dischargeable under 11 U.S.C. Sec. 523(a)(5).

### Second: $15,628 Equalization Payment:

██ This award is argued to be a support obligation by Elena Pino while Jorge Pino asserts it is merely an "equalization" based on the disparity of property values in the case. There are two exhibits reflecting on this award, Px–16 which is a letter from the divorce court judge to the divorce counsel stating her decision and asking counsel to draft the final judgment; and the final judgment itself, Px–2. In her letter the judge states:

OFFSETS. Both parties have argued for offsets *to the property distribution.* The final page of Schedule B prepared by the court indicates the offsets I have allowed. The final distribution leaves a balance of $15,628.39 payable by the Petitioner (Jorge) to the Respondent (Ele-

na). This amount shall be payable in full within six months from the date of the final decree. (Emphasis added)

Px–2 ¶ 16 starts off by stating "The Court has divided the community property and community liabilities as shown on Schedule B attached." Then Px–2 ¶ 18 includes the exact language of the judge's letter recited above. To be candid, the attached Schedule B is not a model of clarity, especially with the missing pleadings and exhibits from the offset hearing alluded to above. It essentially has columns showing the net value of property being allocated between the parties, with Elena apparently receiving about $32,755.21 more in value than Jorge. It then makes an "equalization" adjustment in favor of Jorge for $15,693.10. Each of the parties is then granted offsets, Jorge received $1,433.72 and Elena received $32,755.21. After adjusting these sums, Elena was awarded the $15,628. The burden of demonstrating that this award falls under the § 523(a)(5) provision is on Elena and the court is unable to find that she has met her burden. The Court finds that the $15,628 Equalization Payment is a marital debt which is non-dischargeable under § 523(a)(15).

*Third: $3,231.49–Levitz Furniture:*

■ The only evidence of this award is its listing in Schedule B of Px–2 and Elena's exhibit Dx–4, which is a demand letter which was identified as relating to the Levitz bill. There was no invoice or other evidence of what was purchased or showing what time the charge was incurred. Elena testified that "most" of the bill was made up of furniture items for the children. Jorge testified that at the time of the divorce the children's rooms were completely furnished, that during and after the divorce Elena had stored excess furniture or given it away to relatives, and that most of the items from Levitz were items such as a sofa, table and chairs. Again, this court is left with little to guide it. At first glance the Levitz debt is just another community debt being allocated to one spouse during the divorce. There is little to show a need to have incurred the debt because the timing and description of purchases is not before this Court. Again, the burden of demonstrating that this debt is one for support or maintenance is on Elena and she has not met her burden. This Court finds that this debt is a marital obligation which is non-dischargeable under § 523(a)(15).

*Fourth: $48,000 line of credit with Norwest Bank:*

■ At some point in the marriage Elena Pino decided to open a child care business. She and Jorge owned a house on Gilberto Avila street in El Paso, Texas which they renovated to operate the business. They obtained a line of credit from Norwest Bank for this purpose. Apparently some of the debt at issue was incurred during the divorce proceedings, after the child care business was no longer being operated. Elena testified that Jorge acquired some of the funds and then used them to purchase his current residence and to improve it, despite an interim order in the divorce proceeding prohibiting him from incurring debt without court approval. Again, this is the interim order not provided to this court. The dates of incurring credit and the amounts was also not entered into evidence. Also, no evidence of the purpose for any advances was introduced. The line of credit itself was clearly originated prior to the divorce proceedings and the amounts, if any, incurred during the divorce are unknown. This debt appears in Schedule B of the divorce judgment as a debt allocated to Jorge. There is no other evidence to show that Jorge's obligation to repay this debt was in any way intended to be a specific support or

maintenance obligation for Elena. The burden of demonstrating that this debt is one for support or maintenance is on Elena and she has not met her burden. This Court finds that this debt is a marital obligation which is non-dischargeable under § 523(a)(15).

### Fifth: Judgment and possible deficiency from foreclosure of Appaloosa residence:

■ The divorce proceedings began in May 1998, the parties were divorced with a Bifurcated Judgment of Divorce and Child Custody on June 28, 1999 (Px–3), Elena Pino vacated the family residence on Appaloosa in or about June 1999, and a Final Judgment on Reserved Issues was entered on June 12, 2000. It was the Final Judgment that allocated "sole responsibility for any deficiency assessed on the Appaloosa residence" to Jorge Pino. He was found by the divorce court to have violated the terms of an interim order (still missing) which required him to make the monthly mortgage payments. By the middle of the divorce proceedings, Elena and the children were no longer living in the Appaloosa residence; thus, making the mortgage payments was not necessary for their support or maintenance. There is no indication as to which monthly payments were missed. Elena is ten years younger than the Debtor, healthy from all evidence, well educated and employed. At the time of the allocation of this debt, it appears to be nothing more than what it says it is. The Court finds that this debt is a marital obligation which is non-dischargeable under § 523(a)(15).

### Sixth: $5,000 to Elena for personal loan:

■ Jorge Pino was divorced once before. In that divorce he was found to owe his ex-wife some money. Elena loaned Jorge $5,000 to resolve that debt. It was a personal loan made in or about 1993.

These facts are not in dispute. Jorge testified that the loan was repaid within 6—7 months from community funds that he and Elena had. At the time he was making most of the income in his new marriage and thus he believes he had fully satisfied any obligation to repay. Elena testified that the money was still owed and she was still making payments to her Credit Union. It is difficult to understand how this relatively small debt could still be due and owing eight years after it was originally incurred. However, that is not a dispute to be determined by this court. The divorce court settled the issue by finding the debt due and allocating it to Jorge. That judgment was not appealed and thus the debt is due and owing. There is no evidence to show that obligating Jorge to repay it was intended as any form of support or maintenance however. The burden of demonstrating that this debt is one for support or maintenance is on Elena and she has not met her burden. This Court finds that this debt is a marital obligation which is non-dischargeable under § 523(a)(15).

### II. Discussion—11 U.S.C. § 523(a)(15)

With respect to the 523(a)(15) cause of action, Counter–Plaintiff's case is established by demonstrating that the debts were incurred by the debtor in the course of a divorce proceeding, was imposed by a court of record in that proceeding, and did not qualify under 523(a)(5). Since the parties agreed that the six debts at issue met the first two prongs of this test, it is this court's ruling that establishes which fall within 523(a)(5) and 523(a)(15). So with respect to debts 2—6 Counter–Plaintiff has proven a prima facie case of non-dischargeability.

■ Section 523(a)(15) was enacted as part of Public Law No. 103–394 and signed into law by the President on October 2,

1994. See *In re Owens,* 191 B.R. 669, 673 (Bankr.E.D.Ky.1996). Section 523(a)(15) was enacted to prevent the discharge of property settlements arising out of divorce proceedings by "the Chapter 7 filing of a 'high income' spouse dissatisfied with the prospect of paying a substantial property settlement to [an ex] spouse." *In re Hesson,* 190 B.R. 229 (Bankr.D.Md.1995) (emphasis and internal quotes added). Section 523(a)(15) provides that:

(a) A discharge under Section 727, 1228(a), or 1328(b) of this Title does not discharge an individual debtor from any debt—(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or Territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 523(a)(15)(A) & (B).

There are a number of legal issues raised by this portion of the adversary proceeding which have to be considered by this Court, as follows:

a. With whom does the burden of proof lie regarding a § 523(a)(15) action?

b. What method should be used to measure the debtor's "ability to pay"?

c. What about a partial discharge?

d. What point in time does the Court use under § 523(a)(15) for purposes of balancing the equities of a discharge v. a non-discharge?

e. Whether the Debtor has the ability to pay the marital obligations set forth in the Final Decree from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor; or, if discharging such marital debt would result in a benefit to the debtor which outweighs the detrimental consequences to a spouse, former spouse, or children of the debtor?

### a. With whom does the burden of proof lie regarding a § 523(a)(15) action?

After the enactment of § 523(a)(15), courts broke into several camps regarding the burden of proof. Generally some courts held that the burden of proof lies with the debtor once the creditor has established that the sued-upon debt arose out of a divorce proceeding; another theory held that the burden remains with the objecting creditor throughout, but the burden of going forward lies with the debtor once the creditor has established that the debt arose out of a divorce proceeding; and yet another theory held that the burden under 523(a)(15)(A) is upon the debtor once the creditor successfully established that the debt arose out of the divorce; and the burden is upon the creditor under 523(a)(15)(B). See cases collected in *In re Willey,* 198 B.R. 1007 (Bankr.S.D.Fla. 1996). In any event, the case law under this statute does clearly establish that the

debtor need only prevail under 523(a)(15)(A) or (B), not both. See e.g. *In re Jodoin*, 209 B.R. 132, 141 fn. 24 (9th Cir BAP 1997) (Courts are generally in agreement that § 523(a)(15)'s subsections present a two-prong test). First, the court must examine debtor's ability to pay. If debtor does not have the ability to pay, the debt is discharged. Only if debtor has the ability to pay does the court then turn to § 523(a)(15)(B) and measure whether the benefit of giving the discharge to the debtor outweighs the detriment that such discharge would cause the nondebtor spouse. *In re Huddelston*, 194 B.R. 681, 689 (Bankr.N.D.Ga.1996); *In re Florio*, 187 B.R. 654, 657 (Bankr.W.D.Mo., 1995); *In re Taylor*, 191 B.R. 760, 764 (Bankr. N.D.Ill.1996).

In *In re Jodoin*, 209 B.R. at 140 in discussing the burden of proof, the Bankruptcy Appellate Panel observed that several courts which have maintained that § 523(a)(15)'s subsections do not shift the burden of proof on the debtor relied heavily on dicta in *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) and the perception that the creditor has the burden of proof for all purposes in § 523(a), citing *In re Butler*, 186 B.R. 371, 373 (Bankr.D.Vt.1995). It noted however that a careful review of *Grogan* indicated that it was actually silent on that point. It dealt only with the burden of proof that a party is required to demonstrate to the court in order to be successful in a non dischargeability action. The B.A.P. opinion did, however, find dicta in *Grogan* to ameliorate the mantra of the "fresh start" argument.

In fact, there is dicta in Grogan that suggest that we should not give overriding preference to the "fresh start" policy of the debtor:

The statutory provision governing non dischargeability reflects a congressional decision to exclude from the general policy of discharge certain categories of debts—such as child support, alimony, and certain unpaid educational loans and taxes, as well as liabilities for fraud. *Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start*, citing *Grogan*, 498 U.S. at 287, 111 S.Ct. at 659–60 (emphasis added). *Jodoin*, at 140 fn. 22.

Bankruptcy law has had a long-standing corresponding policy of protecting a debtor's spouse and children when the debtor's support is required. See *Wetmore v. Markoe*, 196 U.S. 68, 77, 25 S.Ct. 172, 49 L.Ed. 390 (1904) ("The bankruptcy law should receive such an interpretation as will effectuate its beneficent purposes and not make it an instrument to deprive dependent wife and children of the support and maintenance due them from the husband and father, which it has ever been the purpose of the law to enforce."); *Shine v. Shine*, 802 F.2d 583, 585 (1st Cir.1986) ("The exception from discharge for alimony and payments for maintenance and support has long been an accepted part of bankruptcy law.")

There is now a clear majority of courts that find that the complaining creditor has the general burden of demonstrating that the debt falls within 523(a)(15), then the burden of proving that one of the exceptions contained in 523(a)(15) at subparagraphs (A) or (B) is on the debtor. One of the best opinions explaining this is found in *The Matter of Crosswhite*, 148 F.3d 879 (7th Cir.1998) stating:

Upon consideration of the statutory language, the structure of the statute, the legislative history and the case law, we conclude that there is a clear shift in the burden of proof under § (a)(15). The burden of proving initially that she holds

a subsection (15) claim against the debtor should be borne by the creditor (non-debtor/former spouse). To make that showing, the creditor must establish that the debt is within the purview of subsection (15) by demonstrating that it does not fall under § 523(a)(5) and that it nevertheless was incurred by the debtor in the course of the divorce or in connection with a divorce decree or similar agreement. Once that showing has been established, the burden of proving that he falls within either of the two exceptions to non dischargeability rests with the debtor. In short, once the creditor's initial proof is made, the debt is excepted from discharge and the debtor is responsible for the debt *unless* either of the two exceptions, subpart (A) the "ability to pay" test, or (B) the "detriment" test, can be proven by the debtor.

It is logical and reasonable that the debtor bear the burden of proving either exception to non dischargeability. Certainly the Debtor is most able to make the showing, under subpart (A) that he cannot pay the debt. Thus, it is appropriate that the Debtor have the burden of proving his inability to pay the obligations in question. The Debtor is also the appropriate party to make the showing, under subpart (B) that the benefit he receives from not having to pay the debt at issue is greater than the detrimental effects on the creditor—his spouse, former spouse or child—who then must pay the debt. If Congress had intended that the burden be placed on the creditor/former spouse, the provision would have been reversed to require a showing that the detrimental consequences to the creditor outweigh the benefit to the Debtor.

It is true that the burden-of-proof analysis is more complex under subpart (B) because the court must consider the equity of the discharge by weighing its effect on each party. In the end, however, the appropriate judicial methodology follows the same basic approach as the one employed in subpart (A). "The Debtor ultimately must demonstrate that, if the debt is discharged, the benefit to the Debtor of that discharge is greater than the harm to the creditor". To be sure, each party must come forward with the information necessary to make that final assessment: The Debtor alone can show how beneficial the discharge of that debt would be; the creditor alone can demonstrate how detrimental the discharge of that debt would be. Nevertheless, the statute clearly places the ultimate burden on the Debtor to prove to the court, in the manner of an affirmative defense, that the debt should be discharged under subpart (A) because he is unable to pay, or under subpart (B) because the benefit to him outweighs the harm to the creditor.

The Fifth Circuit and two Bankruptcy Appellate Panels have decided the burden of proof issue the same way as the Seventh Circuit. *In re Gamble*, 143 F.3d 223, 226 (5th Cir.1998) (the burden of proof rests with the Debtor to show that one of the exceptions applies.) See *In re Jodoin*, 209 B.R. 132, 141 (9th Cir. BAP 1997)(Because the debtor is the party claiming the exception to the non-dischargeability of the property settlement debt, it is the debtor who has the burden of "coming forward with evidence to establish the viability of either test."); *In re Moeder*, 220 B.R. 52, 56 (8th Cir. BAP 1998)(concluding that sub-parts (A) and (B) were exceptions that "constitute affirmative defenses to non-dischargeability which must be proven by the debtor to escape non-dischargeability of the disputed debt").

**b. What method does the court use to measure the Debtor's ability to pay?**

 In order to resolve disputes under the "ability to pay" exception in

§ 523(a)(15)(A), most courts rely on the "disposable income test" of § 1325(b)(2) of the Bankruptcy Code[1] because that section's language essentially mirrors the language § 523(a)(15)(A). See e.g. *In re Cameron*, 243 B.R. 117 (M.D.Ala.1999); *In re Adams*, 200 B.R. 630, 634 (N.D.Ill.1996); *In re Henrie*, 235 B.R. 113, 120 (Bankr. M.D.Fla.1999); *In re Metzger*, 232 B.R. 658, 663–64 (Bankr.E.D.Va.1999); *In re Bushee*, 211 B.R. 114 (Bankr.D.R.I.1997). This test is described in *Cameron*, at 122:

> Under the disposable income test, the bankruptcy court is to subtract the debtor's budgeted expenses, assuming they are reasonably necessary, from Debtor's income and determine if there is any money left. See *Metzger*, 232 B.R. at 664; *Soforenko v. Soforenko*, 203 B.R. 853, 864 (Bankr.D.Mass.1997); *In re Smith*, 218 B.R. 254, 259 (Bankr.S.D.Ga. 1997) *In re Willey*, 198 B.R. 1007, 1014 (Bankr.S.D.Fla.1996) For purposes of the disposable income test, a debtor's expenses and income include those of his or her new spouse, if applicable. See *In re Gamble*, 143 F.3d 223, 226 (5th Cir. 1998); *In re Leonard*, 231 B.R. 884, 888 (E.D.Pa.1999); *Morris v. Morris*, 197 B.R. 236, 243–44 (Bankr.N.D.W.Va.1996) The emphasis of the court's evaluation under the disposable income test is whether the debtor's budgeted expenses are reasonably necessary. See *Leonard*, 231 B.R. at 888; *In re Tersen*, 234 B.R. 189, 193 (Bankr.M.D.Fla.1999); *Smith*, 218 B.R. at 259; *Willey*, 198 B.R. at 1014.

This disposable income test appears to be the majority view. See e.g. *In re Myrvang*, 232 F.3d 1116 (9th Cir.2000) *In re Gamble*, 143 F.3d 223 (5th Cir.1998); *In re Osborne*, 262 B.R. 435 (Bankr.E.D.Tenn. 2001); *In re Konick*, 236 B.R. 524, 527 (1st Cir. BAP 1999)(It is proper to use the disposable income test to determine [debtor's] ability to pay); *In re Jodoin*, 209 B.R. 132 (9th Cir. BAP 1997).

■ The best statement of the "ability to pay test," in this court's view, is found in *In re Osborne*, 262 B.R. at 444:

> *A debtor is able to repay a § 523(a)(15)(A) obligation if he "has sufficient disposable income to pay all or a material part of a debt within a reasonable amount of time."* citing *In re Armstrong*, 205 B.R. 386, 392 (Bankr. W.D.Tenn.1996). (emphasis added).

**c. What about a partial discharge?**

The Ninth Circuit BAP, in *In re Taylor*, 223 B.R. 747 (9th Cir. BAP 1998), in deciding a student loan hardship discharge decision under § 523(a)(8), prohibited a partial discharge, interpreting the language (such debts) of the section which is very similar to the language in § 523(a)(15). However the Ninth Circuit in *In re Myrvang*, 232 F.3d 1116, 1122 (9th Cir.2000) noted that the Taylor opinion had elicited criticism and had been rejected by a number of courts. It specifically cited the opinion of the Sixth Circuit in *Tennessee Student Assistance Corp. v. Hornsby*, 144 F.3d 433 (6th Cir.1998) which rejected the notion that a bankruptcy court lacks the power to order a partial discharge of a separate liability. That court reasoned that 11 U.S.C. § 105(a) permits a bankruptcy court to order a partial discharge. In Myrvang the Ninth Circuit adopted the reasoning of In re Hornsby, stating that

---

**1.** Section 1325(b)(2) defines "disposable income" as income which is received by the debtor and which is not reasonably necessary to be expended-(A) for the maintenance or support of the debtor or a dependent of the debtor... and (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business. 11 U.S.C. sec. 1325(b)(2).

*"its analysis applies with equal force to dischargeability proceedings under § 523(a)(15)."*(emphasis added)

 The District Court in *In re Cameron*, 243 B.R. 117, 125–26 (M.D.Ala.1999) remanded a case to the bankruptcy court, directing it to consider on remand the merits of granting debtor only a partial discharge, once it determined the debtor's disposable income at the time of trial. The Bankruptcy Court in *In re Miley*, 228 B.R. 651, 656 (Bankr.N.D.Ohio 1998) also has approved the concept of a partial discharge, though it makes that determination only after reviewing § 523(a)(15)(B) first to determine whether the debtor is entitled to have the debt discharged in full. If not, it then looks at the possibility of a partial discharge. This court agrees with these opinions and finds that it has the ability to consider whether the debtor is entitled to a partial discharge of the debts at issue.

**d. What point in time does the Court use under Sec. 523(a)(15) for purposes of balancing the equities of a discharge v. a non-discharge?**

Some courts have determined that the appropriate time for the court to consider the condition of the debtor and the creditor is at the time of filing the petition in bankruptcy. See e.g. *In re Carroll*, 187 B.R. 197, 200 (Bankr.S.D.Ohio 1995); *In re Becker*, 185 B.R. 567, 570 (Bankr.W.D.Mo. 1995); *In re Anthony* 190 B.R. 433, 438 (Bankr.N.D.Ala., 1995). Other courts have looked at the time period running through the time of trial and into the immediate future. See *In re Taylor*, 191 B.R. 760 (Bankr.N.D.Ill.1996).

*In re Dressler*, 194 B.R. 290, 300–01 (Bankr.D.R.I.1996) gives the best argument for applying the "time of trial" as the point in time at which the court should analyze the issues:

Unlike sec 523(a)(5)'s "rear view mirror" analysis, sec 523(a)(15) instructs us to look out the windows. It calls for a "current circumstances" review of non-support divorce obligations and the consequences of discharge upon them. I conclude that the appropriate time to appraise those circumstances is as of the trial date. As one court recently observed:

> In a sec 523(a)(15) case the court is not dealing with the court's or the parties' intent at the time of the decree or agreement. Instead, the court is directed to determine the debtor's ability to pay the debt and weigh the benefit of discharging the debt against the detrimental consequences to the recipient … This is not a historical search, but as with a student loan inquiry under sec. 523(a)(8), is an examination of current circumstances. For example, after the filing of the case, either party might have sustained a disabling injury or may have won the lottery, or have experienced a substantial change in earnings. Post-filing events could easily affect either the debtor's ability to pay the debt or the balance between debtor's benefit from discharge and the detrimental consequences of discharge to the recipient. Use of a time substantially before the trial date could produce a silly result that mocks congressional intent.

*In re Hesson*, 190 B.R. at 238 (citations omitted).

 This view is adopted by the Ninth and the Fifth Circuits in recent opinions. See, e.g. *In re Myrvang*, 232 F.3d 1116 (approving bankruptcy court's imposition of a 5 year payout plan); *In re Gamble*, 143 F.3d 223 (5th Cir.1998) (disagreeing with the debtor's argument that the could not pay because he did not have sufficient

funds at the time of filing the bankruptcy and instead, agreeing that the bankruptcy court was correct to focus its investigation on whether the debtor could make "reasonable payments on the debt from his disposable income", ie/ his ability to pay at time of trial and into the future.).

e. **Whether the Debtor has the ability to pay the marital obligations set forth in the Final Decree from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor; or, if discharging such marital debt would result in a benefit to the debtor which outweighs the detrimental consequences to a spouse, former spouse, or children of the Debtor?**

*1. § 523(a)(15)(A): (Ability to Pay Test)*

 Now the Court has to take the information elicited at the trial and apply the analysis above. It has been decided

that the first debt obligation—attorneys fees—is non dischargeable under 11 U.S.C. § 523(a)(5). Obligations two through six are thus non-dischargeable under § 523(a)(15). The Debtor has the burden of demonstrating the applicability of one of the two exceptions to this section. Thus the Debtor has to show either that he does not have the ability to pay all or a material part of these debts within a reasonable amount of time, or that the benefit of granting him a discharge of these debts outweighs the detriment caused to Elena Pino. § 523(a)(15)(A) or (B).

In reviewing the Debtor's ability to pay, the court received Px. 13A, which was Debtor's purported budget. It was modified with testimony to reflect that the Adjusted Net Income was $5,982.74. This beginning "net" figure already took into account Debtor's gross pay, deducted taxes and social security and child support. From the "adjusted net" additional expenses to be deducted were described as follows:

$1,229.64 shelter
275.00 electric/gas
150.00 water
475.00 telephone
97.69 cable
250.00 home maintenance
1,000.00 food
200.00 clothing
90.00 laundry, dry cleaning
150.00 medical, dental
450.00 transportation
200.00 recreation
50.00 charitable contributions
20.15 car insurance
144.00 tuition, lunches, supplies
520.00 child care
50.00 travel expenses

TOTAL EXPENSES $5,451.48

The math indicates that the Debtor has a "net" income, after expenses and child support of only $ 531.26. However, some adjustments need to be made. According

to the Debtor's testimony, he has now completed adoption proceedings for Jesus. In his "shelter" expense was included a rental for a house in Juarez, Mexico of $350/month. Also included in his expenses is $520/month childcare in Juarez, which was to take care of Jesus. With the adoption completed, it is reasonable to assume and the testimony in the case was consistent with the view that the Juarez "expenses" will soon go away. Thus the Debtor's net monthly income can reasonably be expected to jump to $1,401.26/month. Debtor argued that his "travel expenses" were low and should be increased. However, he also admits that his electric/gas, water and telephone bills include expenses related to the Juarez house and that once Jesus is living with him in the United States, these expenses will go down. The court believes that whatever additional travel expenses should be found to exist will be offset by the savings in these itemized expenses related to the Juarez property.

One additional "wrinkle" that came out at trial was the "new" legal litigation being instigated by the debtor against Elena, relating to custody and child support. The divorce court was located in New Mexico. Since the divorce the debtor, Elena and all the children have relocated to homes in El Paso, Texas. Apparently the Debtor has hired counsel to file a suit to remove venue of the divorce to Texas and to revisit child custody issues and child support issues. No documentary evidence was introduced on this subject, nor did the court hear from the divorce lawyer for either side. However, it was argued and apparently agreed in this hearing that Texas child support guidelines under the circumstances of these two parties would apparently allow for a fairly significant reduction in the current amount of ordered child support. It was stated that support could

fall from the current level of $3,851/month to as low as $1,500/month.

Using the "disposable income" test to determine the debtor's ability to pay also requires one additional factor—time. That is, over what period of time would the debtor be required to make payments. If this were a chapter 13 bankruptcy case, the maximum period of time that a debtor could be required to pay would be 36 months. But, this is not a chapter 13 case. The Ninth Circuit had occasion to review this very issue in a recent opinion. See *In re Myrvang*, 232 F.3d 1116 (9th Cir.2000). In that case the debtors challenged on appeal the bankruptcy court's decision to compel debtor to repay his debt over a five year period, contending that "a five-year payment period is unreasonable as a matter of law." In its analysis, the Circuit stated:

> Whether five-year repayment plans are acceptable in the context of Chapter 7 proceedings appears to be a novel question. The parties do not cite a controlling case, and our research has revealed none. The bankruptcy court's employment of a five-year repayment plan would be impermissible under Chapter 13. For this reason, at least one court has implicitly held that repayment plans under 11 U.S.C. § 523(a)(15) should be limited to three years. See *In re Greenwalt*, 200 B.R. 909, 913 (Bankr. W.D.Wash.1996) (adopting the Chapter 13 test for determining ability to pay under § 523(a)(15)(A) and stating that "[u]nder this standard, the court must critically assess the debtor's budgeted expenses to determine the minimum the debtor could afford to pay over a three-year period").

> Inconsistencies between Chapters 7 and 13, however, are relatively common. Debts arising from fraud, fiduciary fraud, willful and malicious injury, and

matrimonial obligations can be determined to be non dischargeable in Chapter 7 but are fully dischargeable in Chapter 13. Unlike the three-year limitation set forth in Chapter 13, Chapter 7 does not expressly prohibit a bankruptcy court from ordering a debtor to pay the debts in five years.

We are aided in our analysis by the Supreme Court's interpretation of § 523(a) and its exceptions. In *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998), the Court considered an appeal from a bankruptcy court's decision that an award of treble damages against a landlord-debtor for fraud was non dischargeable under § 523(a)(2)(A). *Id.* at 215–17, 118 S.Ct. 1212, 140 L.Ed.2d 341. In affirming, the Court explained that "[t]he various exceptions to discharge in § 523(a) reflect a conclusion on the part of Congress 'that the creditors' interest in recovering full payment of debts in these categories outweigh[s] the debtors' interest in a complete fresh start.'" *Id.* at 222, 118 S.Ct at 1212 (alteration in original) (quoting *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)); see also *In re Bammer*, 131 F.3d 788, 793 (9th Cir.1997) (discussing Grogan and concluding that § 523(a) acts as a limitation on the traditional goal of the Bankruptcy Act to provide debtors a fresh start.) In light of the Supreme Court's view of the Congressional intent underlying § 523(a), it becomes less incongruous for a court to employ the Chapter 13 disposable income test, while at the same time foregoing the three-year plan requirement. Cohen makes clear that the § 523(a) exceptions to discharge under Chapter 7 are special and need not conform precisely to the "fresh start" philosophy of the Bankruptcy Code. The bankruptcy

court did not err in ordering repayment over five years.

This court has considered this issue carefully. In the "real world", that is, outside of bankruptcy court, the divorce decree-ordered debt could be collected over a period of time far exceeding five years. Subject only to some procedural limitations having to do with "dormancy," a judgment can be collected for decades. Also, this Debtor has a reasonable expectation of working at his current job for at least another 7 years. This court feels that under the circumstances of this case a five year repayment period is justified.

Thus, without any "savings" from a child support reduction, the Debtor can reasonably be expected to have at least $84,075.60 available to pay on these debts in the next 60 months, with his current "net income" of $1,401.26. If the Debtor is successful in reducing his monthly child support by only an additional $500/month, he would then have· $114,075.60 available. Testimony indicated that he could have the child support reduced by as much as $2,300/month. The six debts add up to approximately $101,859.49, plus the deficiency on the Appaloosa house. Clearly the Debtor could pay a material part of these obligations and thus he has not met his burden under § 523(a)(15)(A).

**2. § 523(a)(15)(B): (Benefit/Detriment Test)**

In re Osborne, 262 B.R. 435, 444 (Bankr.E.D.Tenn.2001) stated the test for determining the exception to non-dischargeability under § 523(a)(15)(B):

Section 523(a)(15)(B) requires that courts compare each party's financial condition and relative standard of living to "determine the true benefit of the debtor's possible discharge against any hardship the former spouse ... would suffer as a result of a discharge." *In re*

*Patterson,* 132 F.3d 33, 1997 WL 745501 at *3 (6th Cir.1997). The debt should be discharged under § 523(a)(15)(B) only if a debtor's standard of living will fall "materially" below the non-debtor spouse's standard of living if the debt is not discharged. *Id.* at *3 n.1 (citing *Smither,* 194 B.R. 102, 111 (Bankr. W.D.Ky.1996)).

■ Addressing the same issue the Seventh Circuit, *In the Matter of Crosswhite,* 148 F.3d 879, 888 (7th Cir.1998) said:

"We appreciate the difficult role that this statute imposes on courts that are charged with applying that equitable balancing test. Bankruptcy courts have expressed their frustration over the lack of guidance from Congress with respect to this responsibility for balancing the benefit and the detriment in order to reach an equitable resolution (cite omitted). In an effort to meet this difficult responsibility, the bankruptcy courts have developed a 'totality of the circumstances' test as the general method for weighing benefit and detriment..."

*Crosswhite,* at 888 in footnote 16, gathered a number of cases to show that courts use a number of different approaches for applying this umbrella test. That note provides:

Some courts, like the bankruptcy court in this case, follow a finances-based test; others incorporate intangible non-economic factors into their analyses. Some bankruptcy courts count a spouse's contributions under subpart (B). See *In re Gantz,* 192 B.R. 932, 936-37 (Bankr. N.D.Ill.1996) ("The extent to which a spouse's contributions or expenses impact on the debtor should be relevant in balancing the equities."). Some count the contributions of live-in companions on the ground that all income that is part of the debtor's household should be

considered when weighing the equities. See *In re Halper,* 213 B.R. 279, 284 (Bankr.D.N.J.1997); *In re Cleveland,* 198 B.R. 394, 399 (Bankr.N.D.Ga.1996). Other courts focus only on the debtor and creditor and do not take into consideration a spouse's or companion's income. See *In re Willey,* 198 B.R. 1007, 1015 (Bankr.S.D.Fla.1996). There is disagreement, as well, about whether the court should take into account the parties future possible income and expenses in its balancing. See *In re Jodoin,* 209 B.R. 132, 142 (9th Cir. BAP 1997) (noting that the test is properly applied when it weighs the prospective income that the debtor should earn). As the case law has grown, legal scholars and courts surveying the decisions under subpart (B) have noted inconsistent results rather than consensus in the equitable balancing. See, e.g. *Barbara J. Van Gorder,* Section 523(a)(15) of the Bankruptcy Code: A Paving Stone on the Road to the Region of Hades Reserved for Litigation Nightmares, 77 B.U.L.Rev. 1121, 1125, 1146-49 (1997); *Meredith Johnson,* At the Intersection of Bankruptcy and Divorce: Property Division Debts Under the Bankruptcy Reform Act of 1994, 97 Colum L.Rev. 91, 110, 113, 125 (1997).

Some courts have found that the non-debtor spouse would suffer little detriment from the debtor's non-payment of an obligation required to be paid under a hold harmless ruling, perhaps because it could not be collected from the non-debtor spouse or because the non-debtor spouse could easily pay the obligation, or the non-debtor spouse has no assets for creditors to seize, or could file for bankruptcy and receive their own discharge. See, e.g. *In re Willey,* 198 B.R. 1007, 1015 (Bankr. S.D.Fla.1996); *In re Morris,* 193 B.R. 949, 954 (Bankr.S.D.Cal.1996); *In re Huddel-*

*ston,* 194 B.R., 681, 689 (Bankr.N.D. Ga.1996); *In re Woodworth,* 187 B.R. 174, 177–78 (Bankr.N.D.Ohio 1995). This court is not able to tell from the sparse record before it whether or not Elena is "judgment proof" or whether or not she is eligible for her own bankruptcy discharge.

The Fifth Circuit has expressed its opinion adopting the "totality of the circumstances, not just a comparison of the parties relative net worths" as the appropriate test. *In re Gamble,* 143 F.3d 223, 226 (5th Cir.1998).

 Here it is useful to take a look at the non-debtor spouse's budget. It was also disclosed in Px. 13a, but supplemented extensively by testimony. Elena Pino gets paid biweekly, so she "annualized" her income as $4,654.67 monthly. From this she began her deductions as follows:

| $ | |
|---:|---|
| 890.00 | taxes |
| 284.00 | social security |
| 63.16 | medicare |
| 13.00 | life insurance |
| 188.57 | repayment of 401k loan |
| 106.00 | contribution to Core+ |
| 216.00 | repayment of credit union loan |
| 661.00 | house payment |
| 75.00 | electric/gas |
| 70.00 | water |
| 50.00 | telephone |
| 40.00 | cable |
| 125.00 | house maintenance |
| 1000.00 | food |
| 250.00 | clothes |
| 125.00 | laundry, etc. |
| 40.00 | dental insurance |
| 100.00 | gas, oil for vehicle |
| 250.00 | recreation |
| 10.00 | charities |
| 125.00 | car insurance |
| 500.00 | tuition, lunches |
| 200.00 | child care |
| 80.00 | vacation |
| 461.00 | motor home payment |
| 350.00 | Baca attorney fees (divorce attorney) |
| 160.00 | Discover Card bill |
| 500.00 | David Sypes (Texas divorce proceedings attorney) |
| 80.00 | Dillards |
| 67.00 | Sears |
| 75.00 | new refrigerator |
| 63.00 | Orkin |

Total expenses = $ 7,217.73

In addition to her monthly paycheck, Elena Pino also receives child support in the amount of $3,851/month. Adding this to her paycheck of $4,654.67 starts her off with $8,505.67. After deducting her expenses she is left with "net income" of $1,287.94. As with the Debtor, however, her "expenses" deserve a closer look.

First is the Motor Home payment of $461/month. This is not found to be reasonable or necessary. If this expense is deleted, Elena Pino has a "net income" monthly of $1,748.94.

From the evidence presented at trial, there are a couple of reasonably foresee-

able scenarios that are facing the Pinos. First, they are continuing litigation with movement of the divorce court venue and revisiting the child support issues. This causes the "new" $500/month "expense" for Elena for attorney David Sypes, who was identified from the testimony as the attorney handling the new state court litigation. Ultimately this expense will disappear and her "net income" monthly will be $2,248.94. However, from the testimony of the parties, this will likely end up with the child support income being reduced. If it is reduced by the $500 posed as one possible outcome for Jorge Pino, then her "net income" is increased by ceasing to owe additional attorney's fees, but decreased by the reduction in child support, in this example leaving her net income at $1,748.94. If the child support fees are reduced as much as $2,300, which was one supposition discussed earlier, then her "net income" becomes a negative.

The burden of proof on § 523(a)(15)(B) is on the debtor. Even with some belt tightening, under a totality of the circumstances, the Debtor has failed to meet his burden of demonstrating that a discharge of the divorce debts will benefit him more than it will cause a detriment to his ex-spouse.

### 3. Is the Debtor entitled to a Partial Discharge of any of the marital obligations?

■ The Debtor clearly is obligated for six marital debts, none of which are dischargeable under § 523(a)(5) or § 523(a)(15). This Court has found one of the obligations, the reimbursement of Elena's divorce attorney's fees, to fall within the § 523(a)(5) description for non-dischargeable debts. The other five obligations fall, by default, under the § 523(a)(15) category of non-dischargeable debts. This court has also found that the

Debtor failed to meet his burden of proof under either of the exceptions to non-dischargeability under § 523(a)(15)(A) or (B). This is not, however, the same as finding that the Debtor clearly has the ability to pay "all" of the marital obligations.

At best, the Debtor has a sufficient net monthly cash flow to enable him, over an extended five year period, to repay a substantial majority of the debts. However, one of the obligations, the final deficiency amount to be derived once the Appaloosa house is finally sold, is yet unknown. The default judgment revealed in Dx–3 at page 4, paragraph B indicates that the judgment to be in the amount of $558,440.82 and subject to an interest rate of 7.375% per year until paid. Interest therefore accrues at the approximate rate of $41,850/year or $3,432/month. No evidence was introduced at this trial of the value of this house. At best there is a negative inference derived from the fact that neither of these parties sought to have the house awarded to them in the divorce proceeding; the divorce judge merely assessed the expected deficiency against Jorge Pino, the house did not sell during the extended divorce proceedings and it has not sold since the final decree of divorce. This court believes from these facts it is reasonable to infer that a substantial deficiency could result.

This Court is convinced by the evidence that the Debtor cannot pay the Appaloosa deficiency and the five other marital obligations within the five year period it has found to be the reasonable projection for determining Debtor's disposable income. Although the record is sparse with respect to Elena's assets and bankruptcy options, it is apparent to this court that requiring Jorge Pino to do the impossible will not be of any assistance to anyone.

Several of the marital obligations are merely "indemnity" or "hold harmless" lia-

bilities. That is, if Elena Pino did not have any liability on the obligations to Levitz or Norwest, for example, then she would not have any need of this ruling. Only two of the debts are owed directly by Jorge Pino to her. These are the reimbursement for the $15,628 "equalization payment" and the $5,000 "personal loan".

The court finds that the Debtor is entitled to a partial discharge for the marital obligation for the deficiency on the Appaloosa house debt owed to Norwest Mortgage or its successor or assigns. With respect to the obligations owed to Ms. Pino's divorce attorney, Levitz furniture company, and the line-of-credit obligation owed to Norwest, the court finds that IF Elena Pino files for bankruptcy and receives a discharge of her liability to these creditors, that Mr. Jorge Pino is entitled to a partial discharge of his obligation to reimburse or hold her harmless from same. With respect to the direct obligations owed by Jorge Pino to Elena Pino of the $5,000 loan and the $15,628 equalization payment, there will be no partial discharge.

## CONCLUSION

This Court finds that it has jurisdiction over the dispute between these two parties as a core proceeding. There are six defined marital obligations. One, the $30,000 obligation to reimburse Elena Pino for the divorce attorney's fees is a support obligation which is non-dischargeable under § 523(a)(5). The Court finds that Elena Pino failed in meeting her burden of proof to demonstrate that the other five marital obligations fell under the § 523(a)(5) exception to discharge. However, by default these remaining five debts are non-dischargeable under § 523(a)(15).

Jorge Pino then tried to meet his burden of demonstrating that he was entitled to a discharge under the exceptions found in § 523(a)(15)(A) or (B). He failed in that effort. Thus all of the marital obligations are non-dischargeable. The court next considered whether the Debtor Jorge Pino was entitled to any partial discharge. It found that he was so entitled with respect to the obligation owed to Norwest Mortgage, or its successors, on the deficiency owed on the Appaloosa home. It further found that IF Elena Pino obtained a subsequent discharge of her liabilities to certain specified creditors that Mr. Jorge Pino was entitled to a partial discharge of his indemnity liability to Elena Pino on those obligations. Of course, if she does not obtain a release or discharge of those liabilities, his obligation to her remains undischarged. With respect to two of the marital obligations, the $15,628 "equalization payment" and the "$5,000 loan," the court finds no partial discharge is warranted. The Court's Findings of Fact and Conclusions of Law will be effectuated by an Order of even date herewith.